SHARON B. BINGER
BingerS@sec.gov
G. JEFFERY BOUJOUKOS
BoujoukosJ@sec.gov
BRENDAN P. MCGLYNN
McGlynnB@sec.gov
DAVID L. AXELROD
AxelrodD@sec.gov
MICHAEL J. RINALDI (Pa. Bar No. 89693)
RinaldiM@sec.gov
PATRICIA A. PAW
PawP@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PAUL T. RAMPOLDI and WILLIAM SCOTT BLYTHE III,<br><br>Defendants. | Case No. **'16CV2017 JAH  MDD**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

**SUMMARY OF THE ACTION**

1. This is an insider trading case involving the securities of Ardea Biosciences, Inc. ("Ardea"), a California-based biotechnology company. In advance of several announcements between April 2009 and April 2012, Michael J.

1

Fefferman, who was Ardea's Senior Director of Information Technology, tipped his brother-in-law Chad E. Wiegand material, nonpublic information concerning, among other things, an agreement between Ardea and another company to license a cancer drug and an acquisition of Ardea by AstraZeneca PLC ("AstraZeneca").

2. Wiegand, a registered representative associated with a registered broker-dealer ("Broker A"), passed the information about Ardea he received from his brother-in-law to his friend and colleague, Akis C. Eracleous, who was also a registered representative at Broker A. Eracleous shared the nonpublic information about Ardea's 2009 licensing agreement and Ardea's 2012 merger with AstraZeneca with his friend and business associate, Defendant Paul T. Rampoldi, a registered representative at Broker A, and their mutual friend and brokerage customer, Defendant William Scott Blythe III.

3. Defendants Rampoldi and Blythe used the material, nonpublic information they received from Eracleous to trade Ardea securities and to realize illegal trading profits totaling approximately $90,000.

4. By knowingly or recklessly engaging in the conduct described in this complaint, Defendants Rampoldi and Blythe violated and, unless enjoined and restrained, will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**JURISDICTION AND VENUE**

5. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such acts, practices, and courses of business and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

6. The Court has jurisdiction over this action pursuant to Sections 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1, and 78aa].

7. Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of California.

## COMMONLY-USED TRADING TERMS

8. A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) at a later date. Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

9. A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at the specified strike price within a specific time period. Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

## DEFENDANTS

10. **Paul T. Rampoldi**, age 47, lives in San Diego, California. Defendant Rampoldi was a registered representative of Broker A from December 8, 2008, through April 17, 2013, when he resigned as a registered representative. Rampoldi, Eracleous, and Wiegand have been friends since at least 2000, and all three became associated with Broker A on the same day in December 2008. While at Broker A, Eracleous and Rampoldi jointly managed their customer accounts and had an arrangement to split the commissions from these accounts. Eracleous and Rampoldi continued this business arrangement during their subsequent association with another registered broker-dealer ("Broker B"). Rampoldi held Series 7 and 63 securities licenses and currently is employed by Wealth Management Strategies, a California real estate company he partially owns.

11. **William Scott Blythe III**, age 50, lives in San Diego, California. Blythe is the president of Risk Advisor Group, Inc., a California corporation that

3

purports to provide investment advice. Blythe was a close friend and brokerage customer of Eracleous and Rampoldi at Broker A at the time of the conduct described in this complaint.

## RELATED PARTIES

12. **Michael J. Fefferman**, age 43, lives in Escondido, California. From 2007 until January 2014, Fefferman was Ardea's Senior Director of Information Technology. Fefferman has been friends with Wiegand since approximately the mid-1990s when they worked together at a brokerage firm. Fefferman married Wiegand's step-sister in 2002. Fefferman and Wiegand were close personal friends, and they and their families socialized together frequently. Fefferman knew that Wiegand had financial difficulties and occasionally gave or loaned money to Wiegand to help him financially.

13. **Chad E. Wiegand**, age 42, lives in Lakeside, California. In 1990, Wiegand began his employment as a registered representative and was employed by Broker A from December 2008 until March 19, 2013, when he was terminated.

14. **Akis C. Eracleous**, age 48, lives in San Diego, California. In 1993 Eracleous began his employment as a registered representative and was employed by Broker A from December 2008 until April 12, 2013, when he resigned. While at Broker A, Eracleous and Rampoldi jointly managed their customer accounts and agreed to split the commissions from these accounts. Eracleous has been close friends with Wiegand since the 1990s.

15. **Ardea Biosciences, Inc.**, a Delaware corporation, was a biotechnology company focused on the development of therapies for various diseases, and was headquartered in San Diego, California. The company's stock was registered under Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and was traded on the NASDAQ Global Select Market until June 19, 2012, when it became a wholly-owned subsidiary of AstraZeneca. As a result of the acquisition by AstraZeneca, Ardea terminated its registration with the Commission.

16. **AstraZeneca PLC** is a pharmaceutical company headquartered in London, England, and is a foreign issuer with American Depository Shares listed on the New York Stock Exchange under the ticker symbol "AZN." AstraZeneca's stock is registered pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)], and the company files periodic reports and statements with the Commission.

## RELATED ACTIONS

17. In 2015, the Commission filed a lawsuit against Fefferman, Wiegand, and Eracleous alleging they tipped and/or traded Ardea securities based on material, nonpublic information. SEC v. Fefferman, Case No. '15CV1276 (S.D. Cal.).

18. Fefferman, Wiegand, and Eracleous each consented to the entry of judgments against them in the Commission's action. The Court entered judgments and permanently enjoined each of them from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

19. Following the entry of the permanent injunctions, the Commission, in separate administrative proceedings, barred both Wiegand and Eracleous from future participation in the securities industry.

## FACTS

### A. Fefferman Learned Material, Nonpublic Information

20. As Senior Director of Information Technology at Ardea, Fefferman learned material, nonpublic information relating to Ardea and its business, products, and potential corporate transactions, including the information discussed in more detail in this complaint.

21. At all times pertinent to this complaint, Fefferman was subject to a duty to Ardea's shareholders to keep material, nonpublic information regarding Ardea confidential. On or about December 3, 2007, Fefferman signed Ardea's Code of

Business Conduct and Ethics, which specifically prohibited trading on or tipping material, nonpublic corporate information.

### B. Fefferman Tipped Wiegand, Who, in Turn, Tipped Eracleous, Who Then Tipped Rampoldi and Blythe

#### 1. The April 28, 2009 Licensing Announcement

22. In or about March 2009, Fefferman became aware, through his position at Ardea, that Ardea would soon publicly announce a global agreement with Bayer HealthCare, LLC (the "Bayer announcement") concerning the licensing of an Ardea developmental cancer treatment. Knowing that the announcement was likely to have a positive impact on Ardea's stock price, Fefferman tipped this information about the Bayer announcement to Wiegand so that Wiegand could trade on it. Fefferman told Wiegand that the Bayer agreement was a big event at Ardea and that Ardea was "going to get a lot of money." Wiegand in turn tipped the inside information about the Bayer announcement in or about March 2009 to Eracleous, who, in turn, tipped the information to Rampoldi and Blythe contemporaneously.

23. From March 24, 2009, through April 9, 2009, after being tipped by Eracleous, Rampoldi purchased or caused to be purchased 1,085 Ardea shares in his personal brokerage account at Broker A and 1,500 Ardea shares in his sister's account at Broker A. At the time of the purchases, Rampoldi knew or was reckless in not knowing that this tip of material, nonpublic information to Eracleous came from Wiegand and that Wiegand's brother-in-law Fefferman worked at Ardea.

24. On April 23, 2009, after being tipped by Eracleous, Blythe purchased or caused to be purchased 500 Ardea shares in his brokerage account at Broker B. At the time of his purchase, Blythe knew or was reckless in not knowing that this tip of material, nonpublic information to Eracleous came from Wiegand and that Wiegand's brother-in-law Fefferman worked at Ardea.

25. On April 27, 2009, shares of Ardea stock closed at $11.68 per share. The next day, April 28, Ardea publicly announced the Bayer agreement. On April

28, following the announcement, shares of Ardea closed at $13.11 per share, an increase of approximately 12% from the prior day's closing price.

26. Following the Bayer announcement, Rampoldi sold the Ardea shares he had purchased for himself and his sister in advance of the announcement on the basis of material, nonpublic information, realizing $5,693 in illegal trading profits.

27. Following the Bayer announcement, Blythe sold the Ardea shares he had purchased for himself in advance of the announcement on the basis of material, nonpublic information, realizing $931 in illegal trading profits.

    **2. The April 23, 2012 Acquisition Announcement**

      **(a) Fefferman, on Account of His Position at Ardea, Became Aware of Material, Nonpublic Information About a Possible Sale of the Company**

28. As early as September 2011, Ardea's management began contemplating a possible sale of the company. From at least September 2011 through April 2012, several companies expressed interest in acquiring Ardea and held discussions with Ardea management and conducted due diligence.

29. In February and March 2012, AstraZeneca made two non-binding proposals to purchase Ardea starting at $24.17 per share. The offers were contingent upon AstraZeneca's completion of further due diligence, which AstraZeneca conducted at Ardea's San Diego offices from approximately March 19, 2012, through March 22, 2012.

30. As the Senior Director of Information Technology at Ardea, Fefferman was involved in facilitating the due diligence process beginning in late 2011. Fefferman created electronic "data rooms" that contained proprietary information about Ardea and its business operations and arranged for several different companies to have access, including AstraZeneca. As work on a potential acquisition progressed, Fefferman obtained additional material, nonpublic information,

including regarding the certainty of an acquisition, its timing, and the premium to be paid for Ardea stock.

31. On or about April 15, 2012, AstraZeneca increased its offer to purchase Ardea to a price of $30 per share, which reflected a substantial premium over the trading price of Ardea stock at that time. Ardea's board of directors rejected the AstraZeneca offer, but Ardea management continued negotiations with AstraZeneca and other companies.

32. On April 19, 2012, Ardea executives requested that AstraZeneca and one other company submit final purchase offers by Friday, April 20, 2012. AstraZeneca responded and submitted an offer of $32 per share, which Ardea's board of directors accepted on April 20, 2012.

33. Ardea and AstraZeneca jointly announced the proposed acquisition agreement before the opening of securities trading on Monday, April 23, 2012 (the "acquisition announcement").

34. On Friday, April 20, 2012, the last trading day before the acquisition announcement, Ardea's stock price closed at $20.84 per share. On April 23, 2012, following the acquisition announcement, Ardea's stock price closed at $31.62 per share, an approximately 52% increase from the prior trading day's closing price.

        **(b)    Fefferman Tipped Wiegand About the Material, Nonpublic Information Regarding the Ardea Acquisition Negotiations**

35. Beginning in late 2011, Fefferman told Wiegand that he believed Ardea was going to be acquired based on the fact that he had given access to Ardea's data rooms to several pharmaceutical companies conducting due diligence.

36. During the weekend of April 14, 2012, Wiegand visited Fefferman's home. During the visit, Fefferman told Wiegand that an Ardea acquisition would occur soon. From approximately April 15, 2012, through April 19, 2012, Fefferman told Wiegand more details about the possible acquisition of Ardea.

8

37. On or about Friday, April 20, 2012, at 11:52 a.m. Pacific time, Fefferman called Wiegand. Fefferman told Wiegand during the call that he hoped Wiegand had bought Ardea stock, and confirmed to Wiegand that the acquisition was proceeding.

### (c) Wiegand Tipped Eracleous, Who Tipped Rampoldi and Blythe

38. Prior to April 16, 2012, Wiegand told Eracleous that an Ardea acquisition would be happening soon. Around April 17 or 18, 2012, Wiegand told Eracleous that it was time to begin buying Ardea securities. Eracleous understood Wiegand's statement to mean that the Ardea acquisition would occur soon.

39. After receiving material, nonpublic acquisition announcement information from Wiegand during the week of April 16, 2012, Eracleous tipped the information to Rampoldi and Blythe.

40. On April 19, 2012, Eracleous exchanged text messages with Rampoldi and called Blythe. Among other things, Eracleous and Rampoldi discussed the material, nonpublic information relating to the sale of Ardea.

41. During the morning of April 20, 2012, Eracleous and Rampoldi called Blythe and asked him to purchase Ardea securities on behalf of all three of them. Eracleous, Rampoldi, and Blythe decided that, in order to avoid detection, Blythe would fund the purchase of Ardea call option contracts in Blythe's brokerage account at Broker B, and agreed to divide the illegal profits from the Ardea securities trading by allotting fifty percent to Blythe and twenty-five percent each to Eracleous and Rampoldi.

42. During one or more telephone calls on the morning of April 20, 2012, Rampoldi instructed Blythe on how to purchase 100 Ardea call option contracts.

43. On April 20, 2012, at 12:58 p.m. Pacific time, soon after ending a call with Eracleous and Rampoldi, Blythe purchased 100 Ardea call option contracts in his brokerage account at Broker B, costing approximately $5,400.

44. At the time of Blythe's trades on April 20, 2012, Rampoldi and Blythe knew or were reckless in not knowing that this tip of material, nonpublic information to Eracleous came from Wiegand and that Wiegand's brother-in-law Fefferman worked at Ardea.

45. The very next trading day, April 23, 2012, AstraZeneca announced that it was buying Ardea for $32 per share. Almost immediately, Blythe sold all of his Ardea call option contracts and realized illegal trading profits of $83,493 for himself, Rampoldi, and Eracleous. Following the sale, on April 24, 2012, Blythe transferred $50,000 from his Broker B brokerage account to his personal bank account.

46. From April 25 through 30, 2012, Blythe withdrew a total of $43,000 in cash from his bank account. In or around early May 2012, Eracleous, Rampoldi, and Blythe met at Blythe's home where Blythe gave Eracleous and Rampoldi envelopes each containing approximately $20,000 in cash, representing their shares of the illegal Ardea trading profits.

47. In May 2012, Fefferman and his wife, Wiegand, Eracleous, Rampoldi, and Blythe went to a casino in California to celebrate their financial windfall from the Ardea trading. During this trip, Blythe handed Wiegand an envelope containing $2,000, to compensate him for the information Wiegand passed to Eracleous in advance of the Ardea merger announcement.

### (d) Eracleous Shared His Cousin's Ardea Trading Profits with Rampoldi

48. On April 19, 2012, Eracleous, after receiving material, nonpublic information from Wiegand about Ardea's acquisition, purchased 200 Ardea call option contracts in the account of Eracleous's cousin, Eracles Panayioutou, who also was the shared customer of Eracleous and Rampoldi.

49. On April 23, 2012, after the acquisition announcement, Eracleous sold the 200 call option contracts in Panayioutou's account, realizing illegal trading profits of $162,037. In or around July 2012, Panayioutou gave Eracleous $10,000 in

cash as compensation for making the Ardea trades. Eracleous gave $5,000 of those profits to Rampoldi.

### C. Rampoldi and Blythe Each Violated the Federal Securities Laws

50. As detailed above, the information about the two announcements Eracleous tipped to Defendants Rampoldi and Blythe was material and nonpublic. A reasonable investor would have viewed the information as being important to his investment decision.

51. As a corporate insider, Fefferman owed a duty to Ardea's shareholders. In breach of this duty, for a personal benefit, Fefferman tipped the material, nonpublic information about Ardea to his brother-in-law, Wiegand, knowing or recklessly disregarding that Wiegand could be reasonably expected to trade on the basis of that information.

52. Defendants Rampoldi and Blythe knew or were reckless in not knowing that the Ardea information tipped to them was material and nonpublic.

53. Defendants Rampoldi and Blythe knew or should have known that the information tipped to them had been transmitted improperly, in breach of a duty to Ardea's shareholders and for personal benefit.

54. Defendant Rampoldi, a securities industry professional, knew, or was reckless in not knowing that neither he nor Defendant Blythe was permitted to trade on the basis of the information tipped to them. Defendants Rampoldi and Blythe knowingly or recklessly purchased Ardea securities while in possession, and on the basis of, material, nonpublic information.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

55. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 54, inclusive, as if they were fully set forth herein.

56. The information concerning the Bayer announcement and the acquisition announcement that Fefferman tipped to Wiegand and that Wiegand and others further tipped, as alleged above, was material and nonpublic.

57. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

   a. employed devices, schemes or artifices to defraud;
   b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or
   c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

58. Members of the investing public who were trading in Ardea securities at the same time as the Defendants were harmed by the Defendants' gaining of an advantageous market position through insider trading.

59. By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court enter Judgments:

**I.**

Permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Ordering Defendants to disgorge all unlawful trading profits and other ill-gotten gains received as a result of the conduct alleged in the complaint, together with prejudgment interest thereon.

## III.

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## IV.

Granting such other and further relief as this court may deem just and equitable.

Respectfully submitted,

s/ Michael J. Rinaldi
MICHAEL J. RINALDI

Attorney for Plaintiff Securities and Exchange Commission
Email: RinaldiM@sec.gov

Dated: August 11, 2016.